D. H. BROWN, BY JAMES A. MITCHELL, GUARDIAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5633, 5634. Decided October 27, 1926.

*Held*, on the evidence, that the debts were not shown to have been ascertained to be worthless during the taxable year involved.

*Frank M. Dixon, Esq.*, for the petitioner.
*W. Frank Gibbs, Esq.*, for the respondent.

These are proceedings for the redetermination of deficiencies in income tax for 1918, 1919 and 1920, in the amounts of $2,730.13, $31.69 and $7,086.47, respectively. The deficiencies arise on account of the action of the Commissioner in disallowing as deductions bad debts and a loss on account of advances to a corporation of which petitioner's ward was the principal stockholder.

## FINDINGS OF FACT.

The petitioner's ward, D. H. Brown, was adjudged insane in 1924, and the petitioner was duly appointed and qualified as his guardian and instituted these proceedings in that capacity. D. H. Brown is at this time incarcerated in an insane asylum.

For several years prior to 1918, D. H. Brown had been engaged in the coal brokerage business as an individual, under the name of D. H. Brown & Co., with offices in Birmingham, Ala. The business was that of middleman—bringing seller and buyer of coal together, and also buying and selling coal. Paul Lanier was employed as manager of the business.

In April, 1918, a corporation known as the Ajax Coal & Mining Co. was organized with a capital stock of $10,000, of which Brown subscribed and paid for $9,000 in cash, and Lanier $1,000 in cash. Thus Brown became the owner of nine-tenths of the capital stock. That corporation acquired a small tract of mining property on which a wagon mine was then being operated, and acquired forty acres on which it owned the mineral rights and a lease on another forty acres with two or three years to run at the time of the organization of the corporation. The royalties required to be paid were unusually high, being considerably higher than any other royalties in that territory. The seam of coal acquired by the corporation had a slope of about 85 degrees. By reason of the pitch of the coal the timbering cost was at least 35 cents a ton above the average. The workings were spread over a distance of 3,000 feet, necessitating a long haul and abnormal handling charges. The miners were paid by the car, although the coal was sold by the ton, and no weighing device was installed to verify the weights. On account of these circumstances, the corporation could not successfully operate the mine and could not compete with other concerns.

In addition to the money paid out by Brown in acquiring the capital stock of the Ajax Co., in the latter part of 1918 and the first part of 1919, Brown advanced to that corporation a total of $35,000, and about the first of February, 1918, he received from that corporation notes in the amount of $35,000, payable to him, representing the money he had advanced.

In addition to the above advances, Brown made further advances in 1921, 1922 and 1923, until, at the end of 1923, a total of $87,631.91 had been advanced. Of the $35,000 advanced up to February, 1919, $7,000 was repaid, leaving $28,000 of the advances unpaid.

The books of D. H. Brown & Co. showed all the transactions in the coal brokerage business and some of the transactions of D. H. Brown personally, but did not contain a complete record of all of Brown's transactions.

In 1918 the Ajax Co. lost from operations $17,793.98. In 1919 it made a profit of $3,419.19, and in 1920 a profit of $12,937.89. From 1921 to 1925, inclusive, it sustained losses, and in 1925 it was adjudged a bankrupt.

Brown, in his income-tax return for 1918, took a deduction of $15,000 as a loss on account of advances made to the Ajax Co. In

his return for 1920 he claimed $15,976.70 as a deduction on account of bad debts, and $8,076.23 as a deduction on account of "losses and adjustments." The Commissioner conceded the deductibility of $6,239.04 of the total amount claimed.

The debts sought to be deducted are as follows:

| | |
|---|---:|
| George O. Berry | $702.53 |
| Farmer's Cotton Oil & Trading Co. | 1,593.45 |
| Gulf & Ship Island Ry. Co. | 4,110.92 |
| New Orleans Coal Co. | 2,332.32 |
| Southern Railway Co. | 450.90 |
| Southern Railway Co. | 3,340.65 |
| Pratt Engineering Co. | 2,500.00 |
| Atlanta & St. Andrews Bay Ry. Co. | 1,448.55 |
| Gulf States Steel Co. | 826.40 |
| W. M. Murray | 59.10 |
| W. H. Medlin | 153.63 |
| Gude & Co. | 189.15 |

Practically all of the above amounts represented indebtedness on account of coal shipped during 1920.

The books of the taxpayer, while kept on the calendar year basis, were not actually closed until a few days before the 15th of March, 1921, being held open until the income-tax return was about ready to be filed.

The facts and circumstances relating to the various acounts are as follows:

The taxpayer had general information that Berry was nearly insolvent and the chances of collection of his debt looked very doubtful. The account was paid in 1922. The coal for which the account was due was sold to Berry in December, 1920. He was written a letter for the first time asking for payment the latter part of January, 1921.

The account of the Farmer's Cotton Oil & Trading Co. was for coal sold during December, 1920. A partial payment was made on the account January 17, 1921, another payment was made February 4, 1921, and another payment March 3, 1921, making a total amount paid on the account of $909.85, which was paid on or before March 3, 1921, leaving a balance of $1,593.45 unpaid when the income-tax return for 1921 was prepared. This company became financially involved in 1921 and either offered a creditors' settlement or went into bankruptcy in that year.

The Gulf & Ship Island Railway Co. was indebted to the taxpayer for coal shipped over its line to a purchaser but which was confiscated and used by the company. The coal was shipped on November 30, 1920. It was confiscated shortly thereafter, before it reached its destination. The Gulf & Ship Island Railway Co. was in exist-

ence and operating its railroad up until about 1925, when the Illinois Central Railroad Co. purchased it. The greater part of this account was paid during 1921, some of it being paid later.

The account of the New Orleans Coal Co. was for coal sold and shipped during November and December, 1920. The New Orleans Coal Co. was a large concern, to which the taxpayer shipped large quantities of coal. That company claimed that it never received the coal represented by the account and denied liability.

The account against the Southern Railway Co., in the amount of $450.90, was for coal which the taxpayer claimed the railroad had confiscated. This the Railroad Company denied. The account was finally settled in May, 1921.

The account against the Southern Railway Co., in the amount of $3,340.65, was divided into two accounts, one for $3,278.25 for coal shipments, and the other for $62.40 for a claim of some nature. The account was paid in March, 1921. The account was charged off the books because it was sixty days past due and the taxpayer " had no way of telling whether the Southern would go into the hands of a receiver or not."

The Atlanta & St. Andrews Bay Railway Co. owed a balance of $1,448.55, on account of coal sold and shipped during the latter part of 1920, which represented confiscations of coal that had been taken off of other accounts and charged to the railroad. It was paid during 1921.

The Gulf States Steel Co.'s account at the end of 1920 was $826.40. It denied liability for this coal upon the ground that it had never received it. This amount of coal never arrived at the plant of the Steel Company. It remained charged to that company until the taxpayer located the coal and determined where it went. It was finally charged to railroads that had confiscated it and was paid for by them.

The account against W. M. Murray, in the amount of $59.10, was denied by Murray upon the ground that the coal shipped him was of an inferior quality. The taxpayer acknowledged this fact·and made an allowance to Murray.

The account of W. H. Medlin, in the amount of $153.63, represented the unpaid balance due on coal sold in October, 1920. The account had not been paid up to March, 1921, and at that time Medlin's affairs were in bad shape. Later, in 1921, he made a compromise settlement and the taxpayer accepted $55 in settlement.

The account against Gude & Co. was for coal sold the latter part of 1920 but which had not been paid for at the time the books were closed in March, 1921.

The Pratt Engineering Co. had not paid its account up to March, 1921. It was in bad financial condition and in 1921 made a settlement with its creditors and paid approximately 50 per cent.

### OPINION.

TRAMMELL: The first question involved is whether the taxpayer, D. H. Brown, is entitled to a deduction in 1918 or 1919 with respect to advances made to the Ajax Co., and whether he is entitled to a loss with respect to his investment in the stock of that company.

During 1918 and 1919 the Ajax Co. was a going concern. It had net profits during 1919 and 1920 and there is no evidence to show that it was not solvent. There is no evidence that the account due by that company on account of the advances was ascertained to be worthless either in 1918 or 1919. There is no evidence that Brown exercised bad judgment in his control of the corporation in acquiring the properties which the corporation operated. The royalties required to be paid were unusually high and the coal could not be as economically mined and handled as other coal, but these facts did not establish the worthlessness of the debt due by that corporation or the worthlessness of the company's stock.

With respect to the debts charged off before the closing of the books for 1920 in March, 1921, the evidence does not convince us that they were ascertained to be worthless during the taxable year 1920.

> *Judgment will be entered for the Commissioner.*